UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:
WESTPORT HOLDINGS TAMPA,
LIMITED PARTNERSHIP, and
WESTPORT HOLDINGS TAMPA II,
LIMITED PARTNERSHIP,

       Debtors.
_____/

SOUTHPOINT GLOBAL
INVESTMENTS, LLC,

       Appellant,

                    Case No.     8:18-cv-2896-T-33
v.                        Bankr. No.   8:16-bk-8167-MGW

JEFFREY W. WARREN,
as Liquidating Trustee,
and CPIF LENDING, LLC,

       Appellees.
_____/

**<u>ORDER</u>**

In the context of a Chapter 11 bankruptcy proceeding, Appellant SouthPoint Global Investments, LLC, appeals the Bankruptcy Court's order authorizing the Debtors to obtain replacement post-confirmation financing from another lender and granting that lender liens and administrative expense claims that would have priority over those held by SouthPoint. The appeal is fully briefed and, as discussed below, the Court affirms the Bankruptcy Court's order.

# I.   **Background**

University Village is a continuing care retirement community in Tampa, Florida. (Doc. # 10-21 at 9). University Village is comprised of 446 independent living apartments and 46 independent living villas and condominium units (the Independent Living Facility), along with an assisted living and skilled nursing facility (the Health Center). (Id.). The Independent Living Facility is owned by Westport Holdings Tampa, Limited Partnership and Westport Holdings Tampa II, Limited Partnership (collectively, the Debtors), both of which are debtors in the underlying bankruptcy proceeding. (Id. at 2, 9). At all times relevant to this appeal, the Health Center was owned by Westport Nursing Tampa, LLC (WNT), which is not a debtor in the underlying bankruptcy proceeding. (Id. at 3, 9; Doc. # 10-7 at 3).

On September 22, 2016, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. (Doc. # 10-7 at 3; Doc. # 10-30 at ¶ 3). The Bankruptcy Court later appointed Jeffrey Warren as Liquidating Trustee to administer the Debtors' estates.  (Doc. # 10-20 at 38-39; Doc. # 10-30 at ¶ 4).

As part of the bankruptcy proceedings, CPIF Lending, LLC, one of the Debtors' creditors, filed a secured claim in

the amount of $9,781,224.58 based on a $9.5 million pre-petition loan from CPIF in favor of the Debtors. (Doc. # 10-6 at 1, 4; Doc. # 10-7 at 4-5; Doc. # 10-30 at ¶ 5; Doc. # 10-47 at 1, 4). CPIF asserts that the loan was secured by a first-priority lien on substantially all of the Debtors' assets, including the Independent Living Facility, any cash collateral generated by the Independent Living Facility, and substantially all personal property owned by the Debtors. (Doc. # 10-6 at 5; Doc. # 10-7 at 5; Doc. # 10-30 at ¶ 5; Doc. # 10-47 at 5). CPIF's secured claim was subject to objections and an adversary proceeding, which remained pending before the Bankruptcy Court when this appeal was filed. (Doc. # 10-7 at 5; Doc. # 10-30 at ¶ 5). In addition, USAmeriBank[1] loaned money pre-petition to WNT, secured by a first-priority lien on substantially all of WNT's assets, including the Health Center. (Doc. # 10-7 at 5; Doc. # 10-30 at ¶ 6).

In a May 8, 2018, order, the Bankruptcy Court determined that the value of the Independent Living Facility, as collateral for any secured claims, was $12.9 million for

---

[1] USAmeriBank later merged with Valley National Bank, making Valley National the successor-in-interest to the WNT loan. (Doc. # 10-7 at 5).

purposes of confirmation of the Debtors' modified plan of reorganization. In re Westport Holdings Tampa, L.P., et al., Case No. 8:16-bk-8167-MGW, (Doc. # 1010) (Bankr. M.D. Fla. May 8, 2018) (hereafter Bankruptcy Court Docket). Similarly, it determined that the maximum amount of CPIF's pre-petition secured claim was $12.9 million, less outstanding taxes. Id. On appeal, this Court affirmed that valuation on June 28, 2019. (Bankruptcy Court Docket, Doc. # 1505).

The Debtors required approximately $2 million in post-petition financing for, among other things, capital improvements to the Independent Living Facility, including roof repairs, and operational expenses until a sale could be completed. (Doc. # 10-7 at 6-7; Doc. # 10-18 at 6, 9; Doc. # 10-30 at ¶ 7). In April 2018, SouthPoint agreed to extend the Debtors this financing pursuant to a revolving line of credit facility with a $2 million maximum balance (the SouthPoint Loan Facility). (Doc. # 10-7 at 7-8, 10; Exh. A to Doc. # 10-7). Accordingly, the Liquidating Trustee filed a motion to obtain post-petition financing under the terms of the SouthPoint Loan Facility. (Id. at 1).

The Bankruptcy Court found that the Debtors had "an immediate and critical need" for the funds, and the financing would be "necessary and vital to the preservation and

maintenance of the going concern values of the Debtors."
(Doc. # 10-18 at 9). Accordingly, on May 2, 2018, the
Bankruptcy Court entered an order authorizing the Debtors to
borrow up to $2 million from SouthPoint under the terms of
the SouthPoint Loan Facility (the SouthPoint Financing
Order). (Id. at 4-6; Doc. # 10-30 at ¶ 7).

Under the SouthPoint Financing Order and the SouthPoint
Loan Facility, Southpoint received the following liens and
security interests: (1) a first-priority lien on any
unencumbered assets of the Debtors (subject to certain
exceptions under the Bankruptcy Code), (2) a second-priority
lien on all encumbered assets owned by the Debtors, junior
only to those liens held by CPIF and any tax liens, and (3)
a junior-priority lien on all encumbered assets of WNT. (Doc.
# 10-7 at 7; Doc. # 10-18 at 7; Doc. # 10-30 at ¶ 8).

The SouthPoint Financing Order also granted SouthPoint
a superpriority administrative claim under 11 U.S.C.
§ 364(c)(1):

> The Debtors' obligations to repay [SouthPoint] for
> advances pursuant to [the SouthPoint Loan Facility]
> shall be accorded superpriority administrative
> expense status pursuant to Section 364(c)(1) of the
> Bankruptcy Code, superior to any other claims under
> Section 364(c)(1) of the Bankruptcy Code, and
> priority over any and all other claims against the
> Debtors, now existing or hereafter arising, of any
> kind whatsoever, including, without limitation, all

administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code (the **"Superpriority Claim"**), without the need to file any proof of claim. The Superpriority Claim of [SouthPoint] shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(Doc. # 10-18 at 7-8).

The Bankruptcy Court found that the SouthPoint Loan Facility had been negotiated in good faith and at arms' length, and found that SouthPoint was acting in good faith, thereby triggering the "protections offered by Section 364(e) of the Bankruptcy Code, and [SouthPoint] shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise." (Id. at 10).

The SouthPoint Financing Order further provided that all outstanding amounts drawn under the SouthPoint Loan Facility would become due and payable upon the occurrence of a default. (Id. at 8). As pertinent to this case, the SouthPoint Loan Facility documents defined an "Event of Default" as: (1) an order "entered by the Bankruptcy Court in the Bankruptcy Cases, without the prior written consent of [SouthPoint], (i) to revoke, reverse, stay, modify, supplement or amend the

Financing Order, or (ii) to grant or permit the grant of a Lien on the property or assets of either Borrower other than a Permitted Lien," and (2) where a person "shall attempt to grant a Lien in any of Borrowers' properties or assets" or when "any action is commenced by a Borrower that contests any provision of the Financing Order." (Doc. # 10-12 at ¶¶ 8.1(j), (l)).

After the SouthPoint Loan Facility closed, the Liquidating Trustee requested $969,605 for a proposed project to repair and replace portions of the Independent Living Facility's roof. (Doc. # 10-30 at ¶¶ 10, 11). According to the Liquidating Trustee, the roofs at University Village suffered from water intrusion and were in "great disrepair." (Doc. # 10-46 at 8). SouthPoint approved the roofing contract and advanced a $10,000 down payment. (Doc. # 10-30 at ¶ 12). The Liquidating Trustee then entered into the roofing contract. (Id.). SouthPoint funded an additional $100,000 for a progress payment on the roof but then refused two later requests for additional funds. (Id. at ¶¶ 13-15). Up to that point, SouthPoint had advanced a total of $488,000 on the SouthPoint Loan Facility, with $110,000 advanced for the roofing project. (Doc. # 10-46 at 7-8). The roofing

contractor ceased any further work pending payment of its unpaid invoices. (Doc. # 10-30 at ¶ 16).

After approaching several lenders to obtain replacement financing, the Liquidating Trustee filed an expedited motion for approval of a replacement financing facility from Rosemawr Management, LLC, pursuant to 11 U.S.C. §§ 364(c) and (d). (Doc. # 10-25; Doc. # 10-30 at ¶¶ 18-19; Doc. # 10-46 at 9-11). Under the terms of the proposed loan, Rosemawr would make advances of up to $2 million, with an "accordion" feature allowing Debtors to borrow up to an additional $500,000. (Doc. # 10-25 at 7).[2] The proposed replacement financing would be secured by priming liens on all assets of the Debtors and WNT, subject only to existing liens on the assets of WNT. (Id.; Doc. # 10-30 at ¶ 27). In addition, the lender would be granted a superpriority administrative expense claim. (Id.).

CPIF filed a written objection to the requested replacement financing, (Doc. ## 10-27, 10-28), but prior to the hearing, CPIF offered to provide the replacement financing on substantially the same terms and conditions as those offered by Rosemawr. (Doc. # 10-46 at 11-12). CPIF's

---

[2] The expedited motion appears to be wrongly numbered. This citation reflects the actual page number.

offer did, however, contain a more favorable fee structure. (Id. at 12). The Liquidating Trustee accepted CPIF's offer, contingent upon the approval of the Bankruptcy Court, thus resolving CPIF's objection. (Id. at 11-12). SouthPoint did not lodge a written objection to the proposed replacement financing.

According to a signed declaration filed by the Liquidating Trustee in support of the expedited motion, none of the potential lenders approached by the Liquidating Trustee were willing to extend post-confirmation financing on anything other than a priming basis. (Doc. # 10-30 at ¶¶ 20, 26). The Liquidating Trustee stated in his declaration that he believed obtaining this replacement post-confirmation financing was in the best interests of the estate and the creditors. (Id. at ¶ 21).

Further, the Liquidating Trustee averred that replacement financing was necessary to complete much needed capital expenditures, including the roofing contract, and to fund operating expenses until University Village could be sold. (Id. at ¶ 23). According to the Liquidating Trustee, the replacement funding would be necessary to maintain and improve the value of the Debtors' assets, to continue the

business without interruption, and to maximize the sale value for all creditors. (Id. at ¶ 24).

Importantly, the Liquidating Trustee also averred that SouthPoint's and CPIF's interests, as existing secured creditors, would be adequately protected because the replacement financing would be used to increase the value of the collateral "in an amount at least equal to the amount [of the] Post-Confirmation Facility." (Id. at ¶ 28). According to the Liquidating Trustee, the value of the collateral would be increased in four ways.

First, the capital expenditures would increase the collateral's value by no less than the amounts spent. (Id. at ¶ 30(a)). Second, the forthcoming capital expenditures justified an increase in the residents' monthly service fee, resulting in an increased annual revenue of $276,000. (Id. at ¶ 30(b)). According to the Liquidating Trustee, using a "conservative" capitalization rate of 4%, this increased fee would add $1,104,000 in value to the collateral. (Id.). Using a "market-based" 7% capitalization rate, the increase in the monthly service fee adds $1,932,000 in value to the collateral. (Id.).

Third, the anticipated capital expenditures would allow the Liquidating Trustee to implement a marketing program

expected to yield a minimum of four new renters every month, with an average blended monthly rent of $1,854 and a $2,500 community fee per move-in, adding further value to the collateral. (Id. at ¶ 30(c)). Finally, commencing capital improvements enhanced resident support and morale, which prompted residents to undertake repairs and refurbishments on their own, further enhancing the value of the collateral. (Id. at ¶ 30(d)). The Liquidating Trustee stated his belief that, without post-confirmation financing, the going-concern value of the Debtors would decline, making them "significantly less attractive" to potential buyers. (Id. at ¶ 30(e)).

The Bankruptcy Court held a hearing on the replacement financing motion on November 5, 2018. (Doc. # 10-46 at 1). At the hearing, counsel for SouthPoint lodged a "conditional objection" to the replacement financing motion, stating that "the Trustee is not really authorized to borrow monies under the Court-approved financing that we provided without paying off our facility." (Id. at 31). SouthPoint's counsel explained that it stopped making advances under the SouthPoint Loan Facility due to the Liquidating Trustee's lack of progress in selling the Debtors' assets, saying that SouthPoint was "very afraid" of advancing any more money to

the Debtors due to "legitimate concerns about getting repaid." (Id. at 31-32). Counsel pointed to the terms of the SouthPoint Loan Facility and the SouthPoint Financing Order providing that the loan would be paid off in full in the event of a default or an impairment by any other financing. (Id. at 32-33). In conclusion, SouthPoint stated that it had no objection to the CPIF replacement financing, so long as it was repaid the monies it already advanced. (Id. at 33-34).

The Liquidating Trustee responded that the parties were not there to litigate the "default" by SouthPoint but, instead, "[w]e are here to prime them as a lender and we will resolve the disputes with them at a later and appropriate time." (Id. at 34). The Liquidating Trustee explained that it was forced to file the emergency motion for replacement financing because SouthPoint refused to perform under their earlier agreement. (Id. at 34-35).

The Bankruptcy Court stated at the hearing that "[n]o one disputes that the repairs to the roof needed to be made" and that "it's in everyone's interest that the Debtor be sufficiently funded so that it can continue to operate as a going concern." (Id. at 37). As to SouthPoint's objections, the Bankruptcy Court stated that:

SouthPoint relies on its documents. But, you know, I can't overlook the fact that the reason we're here and doing this is because SouthPoint in fact didn't fund what their initial commitment was. And they have, I shall assume, wonderful reasons and we'll litigate those, I'm sure, in due course. But where we are here today is this roof needs to be fixed and we can't be going off and having -- trying major lawsuits as part of that process.

So the idea that we can now require CPIF to fund SouthPoint's piece of the case as part -- a condition to this is way too much at this stage. We'll have to resolve SouthPoint's issues in due course.

But taking everything into consideration, this is a fair and equitable resolution. It's one that harms no one, it improves the value of the collateral, it violates no bankruptcy principle that is not flexible and therefore I will overrule all those objections for purposes of this motion and approve the financing, as announced here in open court.

(Id. at 40-41).

In an order dated November 9, 2018, the Bankruptcy Court memorialized its decision to approve the replacement financing (the Replacement Financing Order). (Doc. # 10-41). In the Replacement Financing Order, the Bankruptcy Court granted the Liquidating Trustee's expedited motion to obtain replacement financing, overruled SouthPoint's oral objection, and found that "approval of the final relief requested in the [m]otion is necessary to avoid immediate and irreparable harm to [the Debtors], is otherwise fair and reasonable, is in the

best interests of [the Debtors] and their creditors, and is essential for the preservation of the value of [the Debtors'] assets." (Id. at 4-5, 8).

Specifically, the Replacement Financing Order authorized the Debtors to borrow up to $2 million from CPIF, with an option to borrow an additional $500,000. (Id. at 11). The Replacement Financing Order granted CPIF first priority priming liens under 11 U.S.C. § 364(d)(1), "ranking prior to all other liens, claims and encumbrances on the Debtor Collateral, and shall prime all other liens and security interests on the Debtor Collateral," whether then existing or later acquired. (Id. at 13). The Bankruptcy Court also granted CPIF, as the replacement lender, first priority liens and security interests in the WNT collateral and in any proceeds from a sale of the post-confirmation collateral, subordinate only to Valley National's existing lien. (Id. at 3, 7-8, 13-14). The Replacement Financing Order also granted CPIF a superpriority administrative expense claim with priority over all other administrative expense claims under 11 U.S.C. § 364(c)(1). (Id. at 14).

As part of the Replacement Financing Order, the Bankruptcy Court made several findings of fact and conclusions of law. (Id. at 5). The Bankruptcy Court found

that good cause existed to approve the replacement financing, explaining that the Debtors needed funding to finance necessary capital expenditures, ensure the continued operation of the business, and enhance, preserve, and maintain the value of their assets in order to maximize a return for all creditors. (Id. at 6). Specifically, the Bankruptcy Court explained that the proceeds of the replacement financing "are intended to allow the Credit Parties to make certain capital expenditures and to continue the operation of [University Village] through the marketing and sale of the assets of [the Debtors and other related parties]." (Id.). The Bankruptcy Court relatedly found that the absence of such financing "would immediately and irreparably harm the Credit Parties, their assets, their creditors and the possibility for a sale of the Credit Parties' assets as a going concern or otherwise." (Id.). The Bankruptcy Court also found that, despite his good faith efforts, the Liquidating Trustee was unable to obtain a loan on any more favorable terms than those offered by CPIF. (Id.).

The Bankruptcy Court also made a finding as to adequate protection of the existing secured creditors, including SouthPoint:

> The Post-Confirmation Liens shall constitute
> priming liens and security interests under Section
> 364(d) of the Bankruptcy Code in the Debtor
> Collateral, ranking prior to any existing liens and
> security interests of any other party in the Debtor
> Collateral, including any liens asserted by CPIF
> and SouthPoint, including, but not limited to, any
> liens granted by [the SouthPoint Financing Order].
> The Court finds and determines that, after granting
> the Post-Confirmation Liens, the interests of any
> and all parties in the Debtor Collateral,
> including, without limitation, . . . SouthPoint,
> are adequately protected within the meaning of
> Sections 361 and 364 of the Bankruptcy Code.

(Id. at 7).

Finally, the Bankruptcy Court found that the terms and conditions of the replacement financing were fair, reasonable, and the best available under the circumstances. (Id. at 8). Pursuant to 11 U.S.C. § 364(e), the Bankruptcy Court also explicitly found that the post-confirmation financing agreements were negotiated at arms' length and in good faith, and that CPIF had acted in good faith. (Id.).

SouthPoint has now appealed the Replacement Financing Order. (Doc. # 10-1; Doc. # 14 at 2). The Liquidating Trustee and CPIF filed responses in opposition (Doc. ## 20, 21), and SouthPoint replied (Doc. # 24). The appeal is fully briefed and is ripe for review.

## II. Legal Standard

### A. Standard of Review

Upon entry of a final order by the Bankruptcy Court, a party may appeal to the United States District Court pursuant to 28 U.S.C. § 158(a). The District Court functions as an appellate court in reviewing decisions of the Bankruptcy Court. Varsity Carpet Servs., Inc. v. Richardson (In re Colortex Indus., Inc.), 19 F.3d 1371, 1374 (11th Cir. 1994). This Court reviews the Bankruptcy Court's legal conclusions de novo but must accept the Bankruptcy Court's factual findings unless they are clearly erroneous. Rush v. JLJ Inc. (In re JLJ Inc.), 988 F.2d 1112, 1116 (11th Cir. 1993). A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." Crawford v. W. Elec. Co., Inc., 745 F.2d 1373, 1378 (11th Cir. 1984) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

### B. 11 U.S.C. § 364

The Bankruptcy Court entered both the SouthPoint Financing Order and the Replacement Financing Order under Section 364 of the Bankruptcy Code. That section contains special provisions pertaining to a trustee's ability to

obtain credit or incur debt while operating the debtor's
business in the course of bankruptcy proceedings. Namely, if
the trustee is not able to obtain unsecured credit, the
bankruptcy court may authorize the obtaining of credit or the
incurring of a debt: (1) with priority over all other
administrative expenses, (2) that is secured by a lien on
unencumbered assets, or (3) that is secured by a junior lien
on already encumbered property. See 11 U.S.C. § 364(c)(1)-
(3). Section 364(d)(1) goes one step further and allows for
"priming" liens, which are liens granted senior or equal to
an existing lien. See Desert Fire Prot. v. Fontainebleau Las
Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings,
LLC), 434 B.R. 716, 725 (S.D. Fla. 2010) (providing definition
of a "priming lien").

Section 364(d)(1) provides:

The court, after notice and a hearing, may
authorize the obtaining of credit or the incurring
of a debt secured by a senior or equal lien on
property of the estate that is subject to a lien
only if:
(A)  the trustee is unable to obtain such credit
     otherwise; and
(B)  there is adequate protection of the interest
     of the holder of the lien on the property of
     the estate on which such senior or equal lien
     is proposed to be granted.

11 U.S.C. § 364(d)(1). "[T]he § 364(d) process is considered
rare and extraordinary, which is why the trustee or debtor in

possession must establish an inability to obtain the necessary credit by any method other than having such credit secured by a senior or equal lien on previously encumbered property." Bland v. Farmworker Creditors, 308 B.R. 109, 115 (S.D. Ga. 2003) (internal quotation marks omitted).

## III. Analysis

### A. Whether the Appeal is Moot under 11 U.S.C. § 364(e)

In their briefs, the Liquidating Trustee and CPIF argue that SouthPoint's failure to seek a stay of the Replacement Financing Order renders this appeal moot under 11 U.S.C. § 364(e). (Doc. # 20 at 16-22; Doc. # 21 at 7-9).

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e). "The purpose of this provision is to encourage the extension of credit to debtors in bankruptcy by eliminating the risk that any lien securing the loan will be modified on appeal." Shapiro v. Saybrook Mfg. Co., Inc. (Matter of Saybrook Mfg. Co., Inc.), 963 F.2d 1490, 1493 (11th

Cir. 1992); see also In re Fla. W. Gateway, Inc., 147 B.R. 817, 820 (Bankr. S.D. Fla. 1992) ("Lenders and suppliers are understandably reluctant to do business with a debtor who is in bankruptcy and who may have few, if any, unencumbered assets to offer as collateral. Section 364(e) is designed to encourage post-petition financing by authorizing security in the debtor's assets and giving the lender priority over administrative costs.").

"Under the express terms of [Section] 364(e), absent a stay pending appeal, an appellate court cannot reverse an authorization to obtain credit or incur debts unless the lender did not act in good faith." Keltic Fin. Partners, LP v. Foreside Mgmt. Co., LLC (In re Foreside Mgmt. Co., LLC), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009). Accordingly, "[m]any courts have held that because [Section] 364(e) prohibits courts from modifying or vacating an order authorizing postpetition borrowing, an aggrieved creditor's failure to obtain a stay pending appeal requires dismissal of the appeal as moot." Id. at 451, 451 n.3 (collecting cases).

Citing the Third Circuit's en banc decision in Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552 (3d Cir. 1994) (en banc), SouthPoint argues that the appeal is not moot because

this Court can fashion it some form of meaningful relief. (Doc. # 24 at 3-4). In Swedeland, the Third Circuit determined that Section 364(e), by its terms, does not require dismissal of an entire appeal if the appellant does not obtain a stay. In re Swedeland, 16 F.3d at 559 (explaining that "section 364(e) never mentions that an appeal may be dismissed if a stay is not obtained" and that "[w]hile the section only protects 'an entity that extended such credit in good faith,' this requirement is not germane to a mootness analysis turning on an appellant's failure to obtain a stay pending appeal").

The Third Circuit found that the statute contemplated that an appeal could go forward in the absence of a stay for "how . . . can [there] be a 'reversal or modification' of an order, if the appeal from the order has been dismissed." Id. The relevant inquiry, according to the Third Circuit, was whether the injured party could obtain some form of meaningful relief even though the superpriority status of the loan protected by Section 364(e) had to be preserved. Id. at 560. Using these principles, the Swedeland court held that, where the proceeds of one post-petition loan had not been fully disbursed, the appeal was not moot as to that loan because "the court could grant [the pre-petition creditor] effective relief simply by prohibiting . . . further advances" under

that loan.  Id. at 561. But, where another post-petition loan had been fully disbursed, the Third Circuit determined that no effective relief could be granted.  Id. at 560-61; see also In re Foreside Mgmt. Co., 402 B.R. at 452 (determining that an appeal was moot where the post-petition lender "has already disbursed the loan in reliance on the Borrowing Order, and those eggs cannot be unscrambled"); Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1489 (9th Cir. 1987) ("The policies behind section 364(e) . . . indicate that a claim is moot as soon as a lender has relied on the authorization. . . . It reflects the general notion that an appeal is moot when a change in circumstances prevents effective relief and the specific notion in bankruptcy law that there is a need for finality in orders regarding stays.").

Here, in its opening brief before this Court, SouthPoint requested one of two forms of relief: (1) subordinating CPIF's administrative expense claim and its first-priority liens to those of SouthPoint, or (2) requiring the Liquidating Trustee to repay SouthPoint as a "condition" to the replacement financing.  (Doc. # 14 at 17).

As to its first request, Section 364(e) makes clear that if the statutory requirements are met, a reversal or

modification on appeal cannot affect the validity of the liens or priorities granted to CPIF in the Replacement Financing Order.  Those statutory requirements lead this Court to two questions: "(1) whether the party challenging the order obtained a stay pending appeal; and (2) whether the lender acted in good faith in extending the new credit."  In re Foreside Mgmt. Co., 402 B.R. at 451.  It is uncontested that SouthPoint did not seek a stay of the Replacement Financing Order from this Court or the Bankruptcy Court.  Thus, the only question is whether CPIF was a good-faith lender.

A finding of good faith is a finding of fact, which is subject on review to the clearly erroneous standard. Unsecured Creditors' Comm. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.), 834 F.2d 599, 605 (6th Cir. 1987).  The Bankruptcy Court here made an explicit finding that CPIF acted in good faith, a finding that SouthPoint does not challenge on appeal. (Doc. # 10-41 at 8; Doc. ## 14, 24).  Nor does the record reveal any indication that the Bankruptcy Court's good-faith finding was clearly erroneous.  See In re Ellingsen MacLean Oil Co., 834 F.2d at 605 (holding that bankruptcy court did not clearly err in finding lender acted in good faith by extending credit to allow debtor to fulfill orders and maintain operations);

<u>Bank of New England v. BWL, Inc.</u>, 121 B.R. 413, 417 n.5 (D. Me. 1990) (finding that where appellant did not raise good-faith issue on appeal or before the bankruptcy court, "there is nothing in the record to suggest that [lender] acted other than in good faith").

Here, the statute's requirements are met, and the priorities and liens granted to CPIF in the Replacement Financing Order must be protected. <u>See</u> 11 U.S.C. § 364(e). Thus, to the extent SouthPoint seeks to invalidate CPIF's superpriority administrative expense claim or priming liens, the appeal is moot. <u>See</u> <u>In re Foreside Mgmt. Co.</u>, 402 B.R. at 451; <u>Weinstein, Eisen & Weiss, LLP v. Gill (In re Cooper Commons, LLC)</u>, 430 F.3d 1215, 1219 (9th Cir. 2005) (holding that the relief sought — invalidating the post-petition financing agreement — "would clearly 'affect the validity of any debt incurred' and therefore fails, mooted by § 364(e)"); <u>A&K Endowment, Inc. v. Gen. Growth Props., Inc. (In re Gen. Growth Props., Inc.)</u>, 423 B.R. 716, 721 (S.D.N.Y. 2010) ("Because the relief sought on this appeal [invalidating a lien granted as part of post-petition financing] cannot be granted, the appeal is moot[.]").

Moreover, to the extent SouthPoint's request that the Liquidating Trustee repay SouthPoint as a "condition to the

financing" (Doc. # 14 at 17) can be interpreted as a request to modify the Replacement Financing Order, such a request would also be moot. See 11 U.S.C. § 364(e) (providing that a "reversal **or modification** on appeal" does not affect the validity or priority of any debt incurred under that section (emphasis added)); see also White Rose Food v. Gen. Trading Co., Inc. (In re Clinton Street Food Corp.), 170 B.R. 216, 220-21 (S.D.N.Y. 1994) (reasoning that Section 364(e) prohibits not only outright invalidation of a lien or priority in the absence of a stay, but also modification of the terms of post-petition lending).

Turning to SouthPoint's argument that the appeal is not moot under Swedeland because this Court could fashion it some form of meaningful relief, the Liquidating Trustee submits in his brief on appeal that, as of April 11, 2019, the replacement financing had not been completely disbursed. (Doc. # 20 at 19, 30). But the Liquidating Trustee urges this Court to consider the entire post-petition loan effectively spoken for because the entirety of the funds will be needed to protect those disbursements already made. (Id. at 19-20). The Third Circuit acknowledged the possibility of such a situation and, in dicta, wrote that "[i]t is possible that the lender's initial disbursements might have left a

particular facility uncompleted so that additional funds
would be required to protect the disbursements made before
the reversal." In re Swedeland, 16 F.3d at 561 n.8.

Here, the Liquidating Trustee stated in his declaration
to the Bankruptcy Court that $2 million in post-petition
financing was needed to complete necessary repairs and
improvements to the Debtors' property and to pay for overhead
expenses so that the Debtors could continue as a going concern
without losing value. (Doc. # 10-30 at ¶¶ 23-24). It seems
to this Court simple common sense that, in the case of a roof
halfway repaired or overhead expenses that are a continuing
part of business, the need for funds will be ongoing. Thus,
cutting off whatever is left of the replacement financing
would serve to harm the value of the Debtors' estate and all
creditors, including SouthPoint. The Liquidating Trustee has
persuaded the Court that such a solution would not effectuate
relief for SouthPoint. Section 364(e), then, serves to cut
off this avenue for relief as well.

The Court's inquiry is not finished, however, because
SouthPoint also argues that the Replacement Financing Order

was entered without providing SouthPoint with adequate protection of its interests.[3]  (Doc. # 14 at 12-16).

The issue of adequate protection is not moot under Section 364(e).  While CPIF must necessarily be "carved out" of any relief this Court can fashion, "Section 364(e) [does] not restrict the Court from reviewing a central question relating to the financing order[]: whether the bankruptcy court provided [SouthPoint] with adequate protection.  To be sure, if [it] did not receive adequate protection, the Court is not forbidden from granting effective relief."  See In re Fontainebleau, 434 B.R. at 746.

B. **Adequate Protection**

Recall that, under Section 364(d)(1), a bankruptcy court may authorize the grant of priming liens "only if (1) the trustee is unable to obtain such credit otherwise; and (2) there is adequate protection of the interest of the holder of

---

[3] The Liquidating Trustee argues that SouthPoint cannot raise this argument because it did not raise an adequate-protection argument before the Bankruptcy Court.  (Doc. # 20 at 14). The Bankruptcy Court, however, expressly considered the issue of adequate protection to SouthPoint, as evidenced in its Replacement Financing Order.  (Doc. # 10-41 at 7).  Given the Bankruptcy Court's consideration of the issue, the question of adequate protection is properly before this Court on appeal. Cf. Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1222 n.8 (11th Cir. 2004) (refusing to consider an argument on appeal that the lower court was not presented with "and did not resolve").

the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). SouthPoint does not argue on appeal that the Bankruptcy Court erred with regard to its finding that the Liquidating Trustee was unable to incur debt without the protections afforded by Section 364(d). See (Doc. # 14 at 12-16). Its argument, rather, focuses on the adequate-protection prong. (Id.).

The parties do not contest that SouthPoint was a secured creditor who was entitled to adequate protection under the statute. (Id.; Doc. # 20 at 26-29). Thus, for the Bankruptcy Court to have approved the priming liens granted to CPIF in the Replacement Financing Order, the Bankruptcy Court had to first find that SouthPoint's interests were adequately protected.

A bankruptcy court's finding of adequate protection is a finding of fact subject to clear-error review. Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d 1017, 1019 (11th Cir. 1984) ("[T]he finding that there was adequate protection will not be overturned unless clearly erroneous."); accord Martin v. United States (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985) ("Upon reviewing the legislative history, we agree with

the line of cases that have held that adequate protection is a question of fact.").

The Bankruptcy Code does not define "adequate protection," but states that adequate protection:

may be provided by –

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that . . . any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. In the case of priming liens, the trustee has the burden of proof on the issue of adequate protection. 11 U.S.C. § 364(d)(2).

Here, the Debtors did not make cash payments or provide additional or replacement liens to SouthPoint. Thus, to have primed SouthPoint's existing lien, the Liquidating Trustee – as the party bearing the burden of demonstrating adequate protection – must have established that the relief granted to SouthPoint would "result in the realization by such entity of the indubitable equivalent of such entity's interest in such

property." 11 U.S.C. § 361(3). Numerous courts have held "indubitable equivalent" to mean "completely compensatory," or nearly so. In re Swedeland, 16 F.3d at 564; In re Martin, 761 F.2d at 476; In re Fontainebleau, 434 B.R. at 748-49.

Adequate protection is designed to preserve the position of existing lienholders and requires a debtor to provide those existing lienholders with the same level of protection they would have had in the absence of any post-petition superpriority financing. In re Swedeland, 16 F.3d at 564. In other words, the adequate protection remedy "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained-for rights." Id. (quotation marks omitted). "Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan." Id. (quotation marks omitted). A determination of whether there is adequate protection is made on a case by case basis. Id.

The Liquidating Trustee argues that the Bankruptcy Court's finding of adequate protection is supported by his uncontested declaration before the Bankruptcy Court that: (1) the Independent Living Facility's value would increase by no less than the amounts expended on capital improvements using

the replacement financing; (2) the improvements to the Independent Living Facility justified raising the residents' monthly service fee, yielding an additional $276,000 annually and which, applying a market-based 7% capitalization rate, adds nearly $2 million to the Independent Living Facility's value; (3) the improvements enabled the Liquidating Trustee to implement a marketing plan to attract new residents; and (4) the improvements have persuaded current residents to remain at the Independent Living Facility and even make improvements on their own, thus increasing the facility's value. (Doc. # 20 at 27). SouthPoint rejects the Liquidating Trustee's declaration as conclusory and unsubstantiated. (Doc. # 14 at 13-14).

As an initial matter, to the extent that the Liquidating Trustee argues that SouthPoint did not introduce any countervailing evidence (Doc. # 20 at 27), the burden of proof on this matter fell to the Liquidating Trustee, not SouthPoint. 11 U.S.C. § 364(d)(2). The only evidence submitted by the Liquidating Trustee on this matter was his declaration in support of the emergency motion for replacement financing. See (Doc. # 10-30).

Ongoing construction or improvements to a debtor's property, standing alone, is insufficient to demonstrate

31

adequate protection. See In re Swedeland, 16 F.3d at 566 ("In the first place, continued construction based on projections and improvements to the property does not alone constitute adequate protection."); In re Fontainebleau, 434 B.R. at 723, 751-53 (concluding that post-petition financing meant to protect the debtor's property – a Las Vegas resort and casino that was only 70 percent complete – from "deterioration and damage" did not adequately protect pre-petition secured creditors because there was no record evidence demonstrating what, if anything, the debtors offered those creditors to offset the decrease in the value of their interests caused by the priming liens).

Instead, "[w]hen formulating adequate protection in connection with post-petition financing on a priming basis, preserving or enhancing the value of the collateral must be viewed side-by-side with the decrease in value of a creditor's interest in the property caused by the priming lien." In re Fontainebleau, 434 B.R. at 754. Accordingly, when considering improvements to debtor property, courts have found adequate protection exists where "the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements." In re Swedeland, 16 F.3d at 566; see also In re 495 Cent. Park Ave. Corp., 136

B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (finding that creditor's position was adequately protected where the contemplated improvements to be funded with post-petition financing would increase the value of the debtor property above and beyond the amount of creditor's loan).

Here, before the Bankruptcy Court entered the Replacement Financing Order, SouthPoint had expended $488,000 under the Southpoint Loan Facility. (Doc. # 10-46 at 7-8). Under the SouthPoint Financing Order, this meant SouthPoint had a $488,000 first-priority lien on any unencumbered assets of the Debtors and a second-priority lien on substantially all of the Debtors' assets, including the Independent Living Facility and any cash collateral generated therefrom, junior only to CPIF's existing lien on those assets. (Doc. # 10-7 at 7; Doc. # 10-18 at 7).

The Bankruptcy Court had earlier valued the Independent Living Facility at $12.9 million, a valuation that this Court upheld on appeal. (Bankruptcy Court Docket, Doc. ## 1010, 1505). While the maximum amount of CPIF's pre-petition secured claim was also $12.9 million, CPIF's claim in the adversary proceeding was for approximately $9.7 million. (Doc. # 10-6 at 1, 4; Doc. # 10-7 at 4-5; Doc. # 10-30 at ¶ 5; Doc. # 10-47 at 1, 4). Thus, prior to the Replacement

Financing Order, there existed a roughly $3.2 million equity cushion in the collateral, that would have been sufficient to pay SouthPoint's $488,000 lien. This Court notes that, even if CPIF were to claim the entire $12.9 million value with regard to its pre-petition secured claim, SouthPoint agreed to be subordinated to this lien as part of its post-petition financing agreement. (Doc. # 10-7 at 7; Doc. # 10-18 at 7).

After the Replacement Financing Order was entered, however, the priority stood thus: First, CPIF had a priming lien on all of the Debtors' collateral in the amount of $2 million to $2.5 million. (Doc. # 10-41 at 2-3, 7, 11-13). CPIF then had a second-priority lien in the amount of $9.7 million, pursuant to its pre-petition loan. Then came SouthPoint's lien, in the amount of $488,000. In effect, the Replacement Financing Order pushed SouthPoint down a level of priority and diverted $2 million in repayment priority in favor of CPIF.

Thus, viewing this decrease in value of SouthPoint's interest side-by-side with the alleged increase in the property's value, the only way to justify CPIF's super-priority lien based on the value of the property is to show that somehow SouthPoint's interest in the collateral has been increased by the value of the CPIF loan – at least $2 million.

34

See In re Swedeland, 16 F.3d at 566; In re Fontainebleau, 434 B.R. at 754.

First, this Court finds the Liquidating Trustee's bald statement in his declaration that the capital expenditures paid for by the replacement financing "will increase the value of the Collateral by no less than the amounts expended thereon" to be conclusory and factually unsupported. In re Windsor Hotel, L.L.C., 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) ("A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis."). Similarly, the Liquidating Trustee's assertion that the capital expenditures have improved resident morale and inspired current residents to make voluntary repairs and refurbishments to the property is too speculative and imprecise to support an adequate protection finding.

However, the Liquidating Trustee also stated in his declaration that, because of the capital expenditures and improvements to the property, he would implement an increase in the residents' monthly service fee, effective January 1, 2019. (Doc. # 10-30 at ¶ 30(b)). This fee increase will increase revenue by $276,000 annually and, using a "market-based" 7% capitalization rate, will increase the value of the collateral by $1,932,000. (Id.). Additionally, the

Liquidating Trustee averred that, based on the post-confirmation improvements to University Village, he had implemented a marketing campaign designed to attract new renters. (Id. at ¶ 30(c)). The Liquidating Trustee expected the marketing program to attract at least four new renters every month, with an average blended monthly rent of $1,854 and a $2,500 community fee per move-in. (Id.). Taken together, these two enhancements to the cash collateral generated by the University Village property – which are additional collateral beyond simply the contemplated improvements – could be viewed as "completely compensatory," or nearly so, of the $2 million loss of value of SouthPoint's interest in the collateral. See In re Swedeland, 16 F.3d at 566; In re Fontainebleau, 434 B.R. at 749, 751. Under the circumstances, this Court cannot say that it was clear error for the Bankruptcy Court to find that SouthPoint's interests were adequately protected. See In re JLJ Inc., 988 F.2d at 1116 (dictating that an appellate court must accept the bankruptcy court's findings of fact unless they are clearly erroneous); Crawford, 745 F.2d at 1378 (explaining that clear error is shown when the reviewing court "is left with the definite and firm conviction that a mistake has been committed").

**C.  Law-of-the-Case and Equity**

Before closing, this Court will address SouthPoint's remaining arguments as to why the Bankruptcy Court erred in entering the Replacement Financing Order.

First, SouthPoint argues that the Bankruptcy Court erred by "supplanting" SouthPoint's superpriority administrative expense claim with CPIF's superpriority administrative expense claim, both of which were granted the protections afforded by Section 364(e). (Doc. # 14 at 9-10). SouthPoint points out that under the SouthPoint Financing Order, its superpriority claim was entitled to the protection of Section 364(e) if that Order "is vacated, reversed or modified, on appeal **or otherwise**." (Id. at 9 (emphasis added)). SouthPoint argues that the SouthPoint Financing Order "remains binding" under the law-of-the-case doctrine. (Id. at 9-10).

Second, SouthPoint argues that the Bankruptcy Court erred because the Replacement Financing Order is "inconsistent" with the SouthPoint Financing Order, in violation of the law-of-the-case doctrine. (Id. at 10). SouthPoint relies on the provisions of the SouthPoint Loan Facility and SouthPoint Financing Order that, it submits,

required full repayment of its loan before the Bankruptcy Court could approve replacement financing. (Id. at 10-11).

Finally, in its reply brief, SouthPoint raises an argument that equity requires that the proceeds of the Replacement Financing Order be used to repay SouthPoint. (Doc. # 24 at 5-8).

Again, to the extent SouthPoint seeks the invalidation or modification of the terms of the authorizations, priorities, or liens granted in the Replacement Financing Order, the appeal is moot under Section 364(e). In the interests of completeness, however, this Court will address each of SouthPoint's arguments in turn.

### 1. "Supplanting" of SouthPoint's Superpriority Administrative Expense Claim

As an initial matter, the Court notes that Section 364(e), by its plain terms, only protects the granting of a priority or lien from "reversal or modification **on appeal**." 11 U.S.C. § 364(e) (emphasis added). The SouthPoint Financing Order did not get reversed on appeal, but, rather, by the Bankruptcy Court itself. But more importantly, SouthPoint did not raise this argument before the Bankruptcy Court. See (Doc. # 10-46 at 31-35).

As a general rule, an issue "not raised in the [bankruptcy] court and raised for the first time in an appeal will not be considered by the [appeals] court." Blue Martini Kendall, LLC v. Miami Dade Cty. Fla., 816 F.3d 1343, 1349 (11th Cir. 2016) (citing Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004)). This Court may consider issues raised for the first time on appeal under five circumstances: (1) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (2) the appellant raises an objection he had no opportunity to make in the court below; (3) where the interests of substantial justice are at stake; (4) where the proper resolution of the issue is beyond any doubt; and (5) the issue presents significant questions of general impact or of great public concern. Access Now, 385 F.3d at 1332. None of those circumstances are present in this case. Therefore, this Court will not consider this argument, which was raised for the first time on appeal.

## 2.   The Entering of "Inconsistent" Orders

Pointing to various terms contained in the SouthPoint Loan Facility and SouthPoint Financing Order, SouthPoint argues that the Replacement Financing Order was "inconsistent" with the terms of the SouthPoint Financing

Order and deprived SouthPoint of its "vested rights." (Doc. # 14 at 10-12). The only legal doctrine SouthPoint points to in support of this argument is the law-of-the-case doctrine. (Id.). SouthPoint has not directed this Court to any case law requiring the Replacement Financing Order be overturned in these circumstances.

SouthPoint's arguments are not meritorious.[4] First, the SouthPoint Financing Order never reached "law of the case" status. The law of the case doctrine bars the relitigation of issues that were decided, either explicitly or implicitly, in an earlier appeal of the same case. See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1291 (11th Cir. 2005) ("The [law of the case] doctrine operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal."); A.A. Profiles, Inc. v. City of Fort Lauderdale, 253 F.3d 576, 582 (11th Cir. 2001) ("Generally, the law of the case doctrine requires a

---

[4] While the Liquidating Trustee is correct that SouthPoint never raised a law-of-the-case argument before the Bankruptcy Court, the Court considers this argument an extension of its objection, raised at the hearing on the replacement financing motion, that the replacement financing should be conditioned on repayment of its loan under Sections 2.9(d) and 8.1 of the SouthPoint Loan Facility and Paragraphs 16 and 17 of the SouthPoint Financing Order. (Doc. # 10-46 at 32-34; Doc. # 14 at 10-11).

court to follow what has been explicitly or by necessary implication decided by a prior appellate decision.").

The Eleventh Circuit has noted, however, that "a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the . . . court." Aldana v. Del Monte Fresh Produce N.A., Inc., 578 F.3d 1283, 1289 (11th Cir. 2009). The SouthPoint Financing Order was never taken up on appeal. Instead, that Order remained within the jurisdiction of the Bankruptcy Court and never reached "law of the case" status. See In re Se. Banking Corp., 314 B.R. 244, 248 (Bankr. S. D. Fla. 2004) (explaining that the law of the case doctrine does not extend to issues the appellate court has not addressed).

### 3. Equity

SouthPoint raised the issue of equity, and its related due process arguments, for the first time in its reply brief. (Doc. # 24 at 5-8). "Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." In re Egidi, 571 F.3d 1156, 1163 (11th Cir. 2009). This Court can, however, glean a general argument of equity and fairness in SouthPoint's initial brief, which it will construe as an argument that the Bankruptcy Court abused its discretion in entering the

41

Replacement Financing Order. See In re Foreside Mgmt. Co.,
402 B.R. at 450 (reviewing the bankruptcy court's decision to
approve post-petition financing for an abuse of discretion).

Looking at the circumstances of this case as a whole,
the Court believes that the situation now before it is a prime
example of why the Bankruptcy Court should be allowed to
grant, in certain situations, post-petition financing that
replaces and supplants earlier post-petition financing. The
record reflects that SouthPoint, for reasons of its own,
refused to forward the Liquidating Trustee additional money
under its SouthPoint Loan Facility. (Doc. # 10-30 at ¶¶ 14-
15). According to the Liquidating Trustee, this money was
desperately needed to complete repairs to the facility's
roof, fund other capital improvement projects, and keep the
Debtors' business afloat during the pendency of the
bankruptcy proceedings. (Id. at ¶¶ 23-25; Doc. # 10-46 at 8-
11).

If the Liquidating Trustee had been barred from seeking
such replacement financing, or ordered to divert nearly a
quarter of the proceeds to pay off SouthPoint's loan, none of
these objectives could have been realized. To adopt
SouthPoint's position, then, that its liens could never be
primed or its administrative expenses never subordinated

would restrict a bankruptcy debtor's ability to obtain Section 364 post-petition financing to a single bite at the apple. Subsequent or replacement rounds of financing would be unavailable even where, as here, the lender fails to provide the agreed financing. The Bankruptcy Court's entry of the Replacement Financing Order is entirely consistent with that court's broad authority to carry out the provisions of the Bankruptcy Code. <u>See</u> 11 U.S.C. S 105(a) (investing bankruptcy courts with the power to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"); <u>United States v. Energy Res. Co.</u>, 495 U.S. 545, 549 (1990) ("Th[is] statutory directive [is] consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships."). In short, the Bankruptcy Court fashioned a remedy here that it believed was fair and equitable, and in the best interests of the Debtors, the estate, and the creditors. The remedy it fashioned was not an abuse of discretion, and this Court will not overturn it.[5]

---

[5] Nothing in this Order precludes SouthPoint, the Liquidating Trustee, or any other interested party from litigating the merits of any breach or default under the applicable loan documents.

## IV.  Conclusion

To the extent that SouthPoint seeks invalidation or modification of the priorities and liens granted to CPIF in the Replacement Financing Order, the appeal is moot under Section 364(e).  The Bankruptcy Court's factual finding that SouthPoint's interests were adequately protected in light of the priming lien granted to CPIF under Section 364(d)(1) was not clearly erroneous.  SouthPoint's other arguments do not merit the reversal of the Replacement Financing Order.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

The Bankruptcy Court's November 9, 2018, order authorizing the post-petition financing between CPIF and the Debtors is **AFFIRMED**.  The Clerk is directed to transmit a copy of this Order to the Bankruptcy Court and thereafter close this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 6th day of September, 2019.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE